Marguerite Pierce **DOLCH**, Individually, and as Trustee Under the Last Will and Testament of Edward William Dolch, Deceased, and United California Bank and Edward W. Dolch, Trustees Under Inter-Vivos Trust of Marguerite Pierce Dolch, Plaintiffs,

v.

**GARRARD PUBLISHING COMPANY** and Twin City Printing Company, Defendants.

No. 64 Civ. 299.

United States District Court
S. D. New York.

Aug. 2, 1968.

Irwin Karp, of Hays, St. John, Abramson & Heilbron, New York City, for plaintiffs.

Morton David Goldberg and Richard Dannay, of Ginsberg, Schwab & Goldberg, New York City, for defendants.

## MEMORANDUM

GRAVEN, Senior District Judge (by assignment).

1. In this action the parties seek a declaration as to the rights of the parties under four contracts. The citizenship of all the plaintiffs is diverse from that of all the defendants. The amount in controversy, exclusive of interest and costs, is in excess of $10,000.00. An actual controversy exists as between the plaintiffs and the defendants as to their rights under the four contracts. The trial was to the Court.

2. The plaintiff, Marguerite Pierce Dolch, is the surviving widow of Edward William Dolch, Deceased. He was a distinguished educator and author in the field of children's education. He enjoyed both an international and a national recognition in that field. Marguerite Pierce Dolch has a broad background of knowledge and experience in that field. She joined with her husband in authoring numerous children's books. She was closely associated with him in matters having to do with their publication. Edward William Dolch for twenty-eight years was on the faculty of the University of Illinois. During that period he and his family resided at Urbana, Illinois. In 1959 he retired from the faculty of the University and he and his family moved to California. He died testate on October 3, 1961. Marguerite Pierce Dolch is the Trustee of a trust created under his will. The United California Bank and Edward W. Dolch are the Trustees under an inter-vivos trust created by Marguerite Pierce Dolch dated March 5, 1964. Edward W. Dolch just referred to is the son of Edward William Dolch. Hereinafter when reference is made to Edward W. Dolch or Mr. Dolch, the reference is to the father. Marguerite Pierce Dolch will be hereinafter referred to as Marguerite P. Dolch or Mrs. Dolch. During his lifetime Edward W. Dolch and Marguerite P. Dolch entered into the four contracts here involved. The plaintiffs are the present owners of all the rights of Edward W. Dolch and Marguerite P. Dolch under those contracts.

3. The four contracts here involved were executed between Mr. and Mrs. Dolch and the Twin City Printing Company, an Illinois corporation, through one of its divisions called "The Garrard Press." On May 8, 1962, the Twin City Printing Company assigned all its rights in the contracts to the defendant, Garrard Publishing Company, a Delaware corporation. On January 31, 1962, the Twin City Printing Company merged into the defendant, Twin City Printing Company, a Delaware corporation. The principal place of business of all the entities referred to has been and is at Champaign, Illinois. The defendants, Garrard Publishing Company and Twin City Printing Company, are the succes-

sors to the rights and obligations of The Garrard Press under the four contracts here involved.

4. Commencing prior to 1939 The Garrard Press was engaged in the business of publishing children's books and educational reading aids for children. Robert J. Garrard was its executive head. He had to do with contracts entered into by The Garrard Press with various authors, including Mr. and Mrs. Dolch. He represented it in the negotiations for and in the execution of the four contracts here involved.

Over the years around ninety contracts were entered into by Mr. and Mrs. Dolch and The Garrard Press relating either to the publication of educational aids created by him or to children's books authored by them. The earlier contracts related to educational aids. In 1950 the parties entered into their first contract for the publication of children's books. Thereafter they entered into numerous contracts relating to the publication of such books. Over the years Mr. and Mrs. Dolch together, or Mr. Dolch alone, wrote fifty-seven children's books known as the Dolch Series. The publishing contracts here involved relate to ten of those books.

5. The contracts relating to those ten books are three in number. The dates of the contracts, the titles of the works, and the dates of their publications are next set forth:

| Date of Contract | Title of Work | Date of First Publication |
|---|---|---|
| September 17, 1958 | On the Farm | October 31, 1958 |
| | Tommy's Pets | October 31, 1958 |
| | Zoo is Home | November 8, 1958 |
| | Monkey Friends | October 31, 1958 |
| | In the Woods | November 28, 1958 |
| July 28, 1960 | Stories from Mexico | August 29, 1960 |
| | Stories from Hawaii | September 21, 1960 |
| | Stories from Japan | September 30, 1960 |
| | Stories from India | May 9, 1961 |
| October 17, 1960 | Stories from Alaska | October 3, 1961 |

All the books listed were copyrighted in the name of Mr. Dolch.

The three contracts, except for unimportant variations in wording, dates, names of books and certain royalty figures, are similar. The contract of July 28, 1960, is typical of the three contracts. That contract, in part, is as follows:

"This Contract, entered into in Champaign County, Illinois this 28th day of July, A.D., 1960, between EDWARD W. DOLCH and MARGUERITE P. DOLCH, hereinafter referred to as Authors, and THE GARRARD PRESS, Division of the Twin City Printing Company, a corporation, hereinafter referred to as Publisher,

*WITNESSETH THAT:*

*FIRST*: Authors, having written and being the proprietors of a series of books known as the Folklore of the World, grant to Publisher the exclusive right of publication of the books in said series and the books entitled Stories from Mexico, Stories from Hawaii, Stories from Japan, and Stories from India. * * *

*SECOND*: Publisher agrees to manufacture or arrange for the manufacture of the material at its expense. The design, quality of the materials

used, and the general format shall be consistent with the educational purposes for which the material is intended. Publisher agrees to publish and distribute the material and agrees that its distribution policies shall be consistent with the educational purposes for which the material is intended and the professional reputation of Authors. Publisher agrees to pay to Authors, in equal shares, as a royalty, a sum equal to ten percent (10%) of the net selling price of the first five thousand (5,000) copies to whomever sold of the above title since publication date; and a sum equal to fifteen percent (15%) of the net selling price of all copies sold in excess of five thousand (5,000) copies of said title. It is understood that the royalty shall be based upon the net amount received after the deduction of such discounts and the Publisher shall deem necessary to allow, except that after the sale of five thousand copies the royalty shall not be less than 15¢ per book sold, and after the sale of ten thousand copies to Publisher's distributors for re-sale to retail outlets, the royalty shall not be less than 17½¢ per copy sold. * * * "

The royalty figures in the contracts of July 28, 1960, and October 17, 1960, are the same. In the contract of September 17, 1958, the minimum royalties are 10.-08 cents and 12.6 cents respectively.

6. The ten books in suit, as heretofore noted, were a part of a series of works known as the Dolch Series. That series consisted of fifty-seven books. All of them were at one time published by The Garrard Press. The books in suit were sold and are being sold in hard cover binding principally to schools, school libraries and other libraries. The sales through retail outlets were so small that such sales were discontinued, and since 1960 substantially all sales of the books have been made to schools and libraries.

The educational reading aids for children consisted of games, coloring books and similar items which were known as consumable items. They were usable only once and by one child. The children's books constituting the Dolch Series authored by Mr. and Mrs. Dolch were prepared for use by teachers in the schoolroom for the development of reading ability. They were designed to constitute supplementary reading. They were planned for classroom situations. It appears that they were of the type and kind that would normally be purchased by the school and kept and retained by the school for continued use in teaching. It was heretofore noted that all the books were published and sold in hard cover binding. The plaintiffs seek a declaration that the three contracts here involved do not grant the defendants the right to publish the books in paperback form. In the alternative, in the event that the defendants have the right to publish the books in paperback form, the plaintiffs request a partial rescission of the contracts for failure on the part of the defendants to exploit the publication of the books in that form.

7. Commencing in 1950 and continuing over the years, Mr. and Mrs. Dolch and The Garrard Press entered into numerous contracts for the publication of books authored either by Mr. and Mrs. Dolch or Mr. Dolch alone. The provisions of those contracts were worked out over the years by Mr. and Mrs. Dolch and Mr. Garrard. All of the contracts granted The Garrard Press the exclusive right of publication of the books named therein. Commencing in 1954 a provision was added which appears in the Second paragraphs of the three contracts here involved. The words of that provision are as follows:

"The design, quality of the materials used, and the general format shall be consistent with the educational purposes for which the material is intended. Publisher agrees to publish and distribute the material and agrees that its distribution policies shall be consistent with the educational purposes for which the material is intended and the professional reputation of Authors."

Commencing in 1955 the contracts contained provisions relating to minimum royalties.

After the parties had completed their negotiations in connection with the three contracts here involved, Mr. Garrard prepared drafts of them and sent them to an attorney for Mr. and Mrs. Dolch to review. After reviewing them he transmitted them to Mr. and Mrs. Dolch. They signed them and returned them to Mr. Garrard. Neither Mr. and Mrs. Dolch nor their attorney suggested any changes.

8. The defendants contend that under the three publication contracts The Garrard Press was granted the right to publish the books named therein without limitation as to the matter of the binding. That contention is based upon the provision contained in the First paragraph of each contract granting The Garrard Press "the exclusive right of publication of the books * * *." In that connection the defendants stress that the provision contains no reference to the type or types of editions or bindings of the books which might be published thereunder and that such provision does not purport in any way to limit the publication rights to books with hard cover bindings.

The plaintiffs' contentions in this connection are set forth in their post-trial brief. Those contentions are as follows:

"Plaintiffs submit that all of the provisions [of the contracts] must be given effect * * * to determine the extent of the rights granted, including: the second sentence of Paragraphs SECOND [heretofore set forth] which imposes limitations on the design, format and materials of the edition that may be published; and the royalty provisions which also limit the rights granted.

"Plaintiffs contend that, giving effect to these specific provisions, the contracts granted defendants only the right to publish a hard cover edition of the Dolch Children's Books.

"(i) This is the only construction possible if effect is to be given to the specific and special provisions of the royalty clause in the latter part of Paragraph SECOND of the contracts.

"(ii) This is the construction which the parties themselves made before the controversy and the litigation began.

"(iii) This is the construction which is consistent with the surrounding circumstances and the purposes of the contracts. * * * *"

The contentions of the plaintiffs are, in substance, that (a) the provisions of the contracts granting The Garrard Press "the exclusive right of publication of the books" are by two other provisions of the contracts limited to books with hard cover bindings and (b) that the evidence adduced by them as to the circumstances surrounding the contracts and their construction by the parties prior to controversy establishes that the provisions granting The Garrard Press "the exclusive right of publication of the books" granted only the right to publish the books with hard cover bindings. In reply to the contentions of the plaintiffs just referred to, the defendants made a number of contentions. They contend that the two provisions of the contracts relied on by the plaintiffs as limiting the publication rights granted to hard cover bindings cannot reasonably be construed as so doing. They also contend that what the plaintiffs seek to do by means of the evidence adduced by them is to vary the terms of the contracts by parol evidence.

9. The controversy between the parties as to the matter of the publication of the books in paperback form arose because of certain developments in the pertinent publication field. Prior to and at the time of the execution of the three contracts in question, for all practical purposes the only market for the Dolch Series books of the type here involved was schools and libraries. Schools and libraries were purchasing the books solely in hard cover bindings. There was and is a very substantial market for

those books in those bindings. The royalties paid on the ten books covered by the three contracts here involved during the period from 1960 through 1967 amounted to $117,217.00. The total royalties on all of the Dolch Series books during the same period were in excess of $600,000.00. Subsequent to the execution of the three contracts, there was the development that schools would purchase children's books of the type and kind here involved in paperback form. The demand for such books in such bindings had developed to some extent by 1963. By 1964 and 1965 the demand increased very greatly. It was greatly stimulated by the advent of Federal grants for elementary educational purposes.

Some time prior to June, 1963, Mrs. Catherine McAndrew, a daughter of Mr. and Mrs. Dolch who was an attorney, either contacted or was contacted by the Dell Publishing Company in regard to the matter of the publication of the ten books here involved in paperback form. On June 28, 1963, the Dell Publishing Company made a proposal to Mrs. McAndrew in regard to the matter of the publication of the ten books here involved. Following further negotiations the Dell Publishing Company on October 31, 1963, tendered to Mrs. Dolch and the other parties in interest a proposed contract for execution by them. In the proposed contract it was provided that the Dell Publishing Company would publish at least one hundred thousand copies of each of the ten books in paperback form. It further provided for an advance payment against royalties of $10,000.00. It further provided that the royalty rate would be 10 percent of the retail cover price, except as respect to sales made to book clubs the royalty rate would be 4 percent of the retail cover price. It further provided that the retail price of the books should be not less than 50 cents nor more than $1.25.

In June, 1963, Mrs. McAndrew called on Robert J. Garrard and informed him that it was claimed by the plaintiffs that the three contracts did not grant The Garrard Press the right to publish the ten books in paperback form. She also informed him that the plaintiffs proposed to enter into a contract with another publisher for the publication of the books in paperback form. Mr. Garrard informed her that the plaintiffs did not have the right to grant paperback publication rights to another publisher. He also told her that she should inform the proposed publisher as to the provisions of the three contracts here involved. Mrs. McAndrew informed him it would seem that litigation would be required to determine the controversy. It appears that the plaintiffs signed the contract proposed by the Dell Publishing Company but never delivered it. The nondelivery was occasioned by Mr. Garrard's controverting the right of the plaintiffs to grant paperback publication rights to another publisher. On January 28, 1964, the plaintiffs commenced the present action.

It was the testimony of both Mrs. Dolch and Mr. Garrard that at no time during the negotiations of the three contracts here involved or in connection with the execution of the contracts was any discussion had or reference made to the matter of the paperback publication of the books. The first time the plaintiffs or their predecessors in interest claimed or asserted that the three contracts granted publication rights only as to books in hard cover form was at the meeting of Mrs. McAndrew and Mr. Garrard in June, 1963.

■ 10. The first contention of the plaintiffs will next be considered. The plaintiffs assert, and correctly so, that in construing a contract all of its provisions must be given consideration. It is the contention of the plaintiffs that the provisions granting The Garrard Press "the exclusive right of publication of the books" are limited by two other provisions of the contracts to publication of the books in hard cover form. The first of such provisions relied on by the plaintiffs is a provision contained in the Sec-

ond paragraphs of the contracts. That provision is, in part, as follows:

"*SECOND*: Publisher agrees to manufacture or arrange for the manufacture of the material at its expense. The design, quality of the materials used, and the general format shall be consistent with the educational purposes for which the material is intended. Publisher agrees to publish and distribute the material and agrees that its distribution policies shall be consistent with the educational purposes for which the material is intended and the professional reputation of Authors. * * *"

The plaintiffs by negotiating with the Dell Publishing Company for publication of the ten books here involved in paperback form indicated that they did not regard the publication of them in paperback form as being inconsistent with the educational purposes of the books and the professional reputation of the authors. The same attitude is indicated by their requesting that the contracts be partially rescinded because of the failure of the defendants to publish the books in paperback form. There is other evidence to the effect that publication of the books in paperback form would not be inconsistent with the educational purposes of the books and the professional reputation of the authors.

■ The Court finds and holds that the provisions referred to cannot reasonably be construed as withholding the right of paperback publication.

11. The plaintiffs contend that the royalty provisions of the contracts are such as to limit the granting of "the exclusive right of publication of the books" to the publication of books with hard covers. That contention is based largely on the claim that the minimum royalties proposed for in the contracts would be applicable to all sales in paperback form and that the price at which they would have to be sold negatives publication in that form.

The contracts provide for a royalty of 10 percent of the net selling price of the books up to five thousand copies and of 15 percent on the copies in excess of that number. The contracts also provide for minimum royalties ranging from 10.08 cents up to $17\frac{1}{2}$ cents. It appears that the range of prices at which the hard cover editions of the books are selling and have been selling has been such that the minimum royalty provisions have not been of serious importance. It also appears that the price range of all books in paperback form is somewhat lower than the price range of such books in hard cover form.

It was heretofore noted that the principal market for the ten books here involved was schools. Those sales are referred to by the parties as educational sales. It was also heretofore noted that the sales of those books through retail outlets had been so few in number that such sales were discontinued.

It is the claim of the defendants that the minimum royalty provisions in the contracts are applicable only to certain retail sales and therefore would not be applicable to educational sales in paperback form. The plaintiffs contend that the minimum royalty provisions would be applicable to such sales.

In the present case the only declaration sought by the parties as to the three contracts is a declaration as to whether Mr. and Mrs. Dolch did or did not grant to The Garrard Press the right of paperback publication. In the pretrial order it is stated that such is the issue here involved as to the three contracts. In other words, only the right of paperback publication is involved. There are not involved issues as to terms and conditions relating to paperback books when and if published.

The defendants assert that even if the provisions as to minimum royalties would be applicable to educational sales in paperback form it would be economically possible for them to publish the books in that form. In this connection it is to be noted that the plaintiffs in the alternative request partial rescission of the contracts for failure of the defen-

dants to exploit the books in paperback form. It was heretofore noted that it was the view of the plaintiffs that the minimum royalty provisions would be applicable to all sales in paperback form. There inheres in that view and in the request for partial rescission the theory that the defendants could have exploited the books in paperback form under the minimum royalties and other royalties specified in the contracts.

The three contracts here involved, apart from the minimum royalty provisions, provide for a royalty of 10 percent of the selling price for the first five thousand copies and 15 percent of the selling price for copies in excess of five thousand. If the potential market for the books in paperback form is as indicated by the proposal of the Dell Publishing Company to publish at least 100,000 copies of each, the 15 percent royalty in the three contracts would doubtless come into effect.

The plaintiffs presented evidence as to the range of sale prices for other books in paperback form. However, the most relevant consideration would be that of the probable price in paperback form of the ten books here involved. There is evidence directly in point as to that matter. In the proposal of the Dell Publishing Company relating to those identical books in paperback form, the price range specified was from 50 cents to $1.25. In this connection it is to be noted that if the sale prices of the books here involved in paperback form were in the upper ranges of the prices just referred to and the 15 percent royalty were applicable, the royalty would approximate the different minimum royalties.

■ The Court is of the view and holds that the provisions of the three contracts as to royalties cannot reasonably be construed as limiting "the exclusive right of publication" to the publication of books with hard covers.

12. At the trial the defendants made a number of objections to evidence offered by the plaintiffs based upon the parol evidence rule. The evidence objected to was received subject to the objections, and the objections were submitted with the case.

The parties are in agreement that the parol evidence rule is a matter of substantive law. They are also in agreement that the substantive law applicable is the law of Illinois.

■ The law of Illinois as to parol evidence will next be considered. The Illinois rule as to parol evidence is that when the parties to a contract have reduced it to writing the written instrument is presumed to speak the intention of the parties and parol evidence is not admissible to contradict, enlarge, explain or modify the writing. Linn v. Clark (1920), 295 Ill. 22, 128 N.E. 824; Saddler v. National Bank of Bloomington (1949), 403 Ill. 218, 85 N.E.2d 733; Western Illinois Oil Company v. Thompson (1962), 26 Ill.2d 287, 186 N.E.2d 285.

In the case of Linn v. Clark, supra, the Supreme Court of Illinois stated (p. 828 of 128 N.E.):

"* * * The rule in regard to the exclusion of parol evidence to affect a written instrument and the reasons for the rule are stated by Greenleaf in section 275, as follows:

" 'When parties have deliberately put their engagements into writing in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagements, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking was reduced to writing, and all oral testimony of a previous colloquium between the parties or of conversation or declarations at the time when it was completed or afterwards—as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties—is rejected. In other words, as the rule is

now more briefly expressed, "Parol contemporaneous evidence is inadmissible to contradict or vary the extent of a valid written instrument." '

"The rule applies only to the engagement of the parties and the extent and manner of their undertaking. It does not exclude evidence of the circumstances of the execution of the contract and of facts in connection with it which may tend to explain its meaning by showing the situation of the parties and all their relations to one another and the subject-matter of the contract. As said by the author already quoted (section 277):

"'It is to be observed that the rule is directed only against the admission of any other evidence of the language employed by the parties in making the contract than that which is furnished by the writing itself. The writing, it is true, may be read by the light of surrounding circumstances in order more perfectly to understand the intent and meaning of the parties, but as they have constituted the writing to be the only outward and visible expression of their meaning, no other words are to be added to it or substituted in its stead.'"

13. In the three contracts here involved, The Garrard Press was granted "the exclusive right of publication of the books." The words "exclusively" and "solely" are synonyms. Provident Life & Accident Insurance Company v. Campbell (1934), 18 Tenn.App. 452, 79 S.W. 2d 292, 296. The defendants contend that the surrounding circumstances and the interpretation placed upon the provision in question by the parties prior to the controversy limit the publication rights to books with hard covers. It should be noted that the plaintiffs make no claim of mistake and they do not rely on any trade custom or usage in connection with the meanings of any of the words involved.

It was heretofore noted that during the negotiations of the three contracts here involved and at the time of their execution the parties did not discuss or mention the matter of paperback publication. The parties were familiar with the fact that numerous books of various kinds were being published in paperback form. However, at the time in question there was no market for the ten books involved in paperback form.

The plaintiffs assert, in substance, that the fact the parties during their negotiations preceding the execution of the contracts and at the time of the execution of the contracts did not discuss or mention the matter of possible paperback publication manifested an intent on the part of the parties to exclude paperback publication from the scope of the provisions granting The Garrard Press "the exclusive right of publication of the books." In support of their contention as to the matter of intent, the plaintiffs also rely on certain correspondence between the parties over the years preceding the execution of the contracts. In this connection the rule stated by the Illinois Supreme Court in the case of Linn v. Clark, supra, would seem to be of pertinence. That rule is (p. 828 of 128 N.E.):

"' * * * The writing, it is true, may be read by the light of surrounding circumstances in order more perfectly to understand the intent and meaning of the parties, but as they have constituted the writing to be the only outward and visible expression of their meaning, no other words are to be added to it or substituted in its stead.'"

In the present case the parties as the outward and visible expression of their intent used the words "the exclusive right of publication of the books," which words would encompass paperback publication. Under the rule stated, no other words are to be added or supplied by parol evidence. The plaintiffs by means of the evidence adduced by them, in substance, seek to add or supply words limiting the publication rights granted to hard cover books. Under the parol evidence rule they may not so do.

The plaintiffs also rely upon the rule which is referred to as the practical construction or interpretation rule. That rule is, in substance, that where the language used by the parties to a contract is indefinite or ambiguous and hence of doubtful construction, the practical interpretation by the parties themselves of the language used prior to the time any controversy arose between them is entitled to great weight. That rule is not of assistance to the plaintiffs. In the first place the provision granting The Garrard Press "the exclusive right of publication of the books" is not indefinite or ambiguous. In the second place as soon as the plaintiffs asserted their interpretation as to the matter of paperback publication under the contracts, such assertion was immediately controverted by the defendants.

14. It is the view and holding of the Court that the provisions in the three contracts granting The Garrard Press "the exclusive right of publication of the books" named therein did not limit the publication rights to hard cover books and that those contracts do not prohibit the defendants from publishing the ten books here involved in paperback form.

15. It was heretofore noted that the plaintiffs asked for certain alternative relief in the event it be held that the paperback publication is not prohibited. The alternative relief requested is "* * that the Court to declare that by reason of defendants' failure to work and exploit said paper-back [sic] rights, each of said agreements is partially rescinded, to the extent that the grant of paper-back [sic] rights in the said works is terminated, and said rights are restored to the plaintiff [plaintiffs]." At the time the three contracts were entered into there was no demand or market for the books in paperback form. That demand and market developed in the years following. Up until 1963 there was no discussion between the parties as to the possibility of paperback exploitation of the books. In June, 1963, the plaintiffs for the first time brought up with the defendants the matter of paperback publication. At the same time the plaintiffs asserted that the defendants did not have the right to such exploitation and that litigation would be necessary to determine that matter. The plaintiffs soon thereafter instituted the present litigation.

For the past four years the question of the right of the defendants to make paperback exploitation of the books has been held up by the present litigation. Prior to that time it was held up for a while by the claim of the plaintiffs that the defendants did not have the right to make such exploitation.

It is the view and holding of the Court that the plaintiffs are not entitled to the declaration of partial rescission requested by them.

16. The defendants request declaratory relief in connection with a contract other than the three contracts heretofore referred to. Commencing in 1939 and continuing up into 1960, Mr. and Mrs. Dolch entered into numerous contracts with The Garrard Press relating to the publication and distribution of educational materials such as books, games and other similar works for the education of children.

Prior to 1958 The Garrard Press had acquired an interest in a Missouri corporation known as The Gelles-Widmer Company. It was engaged in the retail distribution of the educational materials referred to.

On May 3, 1958, the contract presently under consideration was entered into. That contract is as follows:

"EDWARD W. DOLCH, hereinafter referred to as Mr. Dolch, and his wife, Marguerite P. Dolch, hereinafter referred to as Mrs. Dolch, both of Urbana, Illinois, have been the authors of various books, games and similar devices for the education of children, and the same have been published and distributed by The Garrard Press, division of Twin City Printing Company, a corporation organized under the laws of the State of Illinois, which will be hereinafter referred to as The

Garrard Press and The Gelles-Widmer Company, a corporation organized under the laws of the State of Missouri, hereinafter referred to as Gelles-Widmer.

"The parties hereto desire to continue the relation to the maximum benefit of all parties concerned. Garrard Press and Gelles-Widmer desire the advice of Mr. Dolch, who is an expert in the field of education of children, in connection with the publication of books, games and similar devices for the education of children. All of the parties wish to protect the professional reputation of the Dolches.

"For the aforesaid reasons and in consideration of the covenants by each of the parties made herein to the others, the reliance placed upon the performance of these covenants by each of the parties in their continued authorship, publication and distribution of the books, games and materials, as aforesaid, and other good and valuable consideration given by each of the parties to the other, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

"1. Neither Garrard Press nor Gelles-Widmer will publish or distribute games or materials designated under or using the name 'Play Way' unless said items are authored or co-authored by Mr. Dolch, except that certain materials designated Flash Cards for arithmetic and the alphabet may be sold and distributed provided that the same are printed prior to the date of this agreement.

"2. Neither The Garrard Press nor Gelles-Widmer will arrange for, print or distribute any advertising of any game or similar material authored or co-authored by either of the Dolches in any booklet, pamphlet, or catalog not devoted exclusively to items authored or co-authored by said Dolches.

"3. The Garrard Press and Gelles-Widmer will make reasonable efforts to show to Mr. Dolch all games or similar materials which they intend to publish, sell or distribute and Mr. Dolch will furnish advice concerning the items but neither The Garrard Press nor Gelles-Widmer need take the advice so given.

"4. If the advice given as set forth in paragraph numbered 3 hereof, involves substantial changes and is accepted and used, Mr. Dolch will be entitled to a royalty depending upon the amount so contributed and to be determined prior to publication. If such advice is not accepted and used, he shall be entitled to no compensation.

"5. The name Dolch shall not be used or referred to in connection with the publication or sale of any games, devices, or books similar to those of which Mr. Dolch is an author or co-author, and *such items* will be published, sold, or distributed with trade name or names, or trademarks, or marks that are distinguishable from Dolch materials. [The underscored words are written in. In the nearby margin appear the initials EWD]

"6. Neither The Garrard Press nor Gelles-Widmer will publish, sell or distribute books in any way designated, or deceptively similar, to 'The Pleasure Reading Series', 'Basic Vocabulary Series' or 'First Reading Book Series', unless the same are authored or co-authored by Mr. or Mrs. Dolch.

"7. Mr. and Mrs. Dolch will give educational advice from time to time concerning ether [*sic*] books, as long as the same does not require research or revision but the advice need not be taken.

"8. Neither Gelles-Widmer nor The Garrard Press shall in any manner advertise that any materials published, sold or distributed by them are approved by or contain suggestions by either of said Dolches unless one of them is an author or co-author of said work.

"9. For the sake of accuracy, the basic descriptive material for all advertising of all Dolch works shall be

first written by Mr. Dolch, and any adapting from this advertising done by either The Garrard Press or Gelles-Widmer shall be done without distortion of fact or emphasis. Both The Garrard Press and Gelles-Widmer agree to attempt to submit all advertising proof to Mr. Dolch for approval whenever it is reasonably possible to do so.

"10. Mrs. Dolch shall be deemed a beneficiary of the various covenants of this agreement whenever benefits are herein conferred upon her.

"11. The breach of items one, two, five, six or eight of this agreement shall be deemed to work irreparable injury upon the Dolches and either of them shall be entitled to an injunction, to prevent breach without making any proof of the irreparable injury resulting from such breach, but nothing herein contained is to limit any remedy which any party might otherwise have under this agreement.

"12. This agreement shall be binding upon the heirs, representatives, successors and assigns of the parties hereto.

"IN WITNESS WHEREOF, the parties hereto have executed this contract, in Urbana, Illinois, in triplicate, each of which shall be deemed an original, on this the 3rd day of May, 1958.

"[Signatures]"

The plaintiffs and the defendants are the present parties in interest as to the contract.

17. The parties are in controversy as to whether under the contract the defendants are or are not now prohibited from including books authored by Mr. and Mrs. Dolch in the same catalog with books authored by others.

The defendants make two contentions. Their first contention is that the contract was automatically terminated by the death of Mr. Dolch and the defendants were thereafter relieved of the obligations of the contract. Their second contention is that if the contract was not so terminated the contract does not prohibit them from including in one catalog books authored by Mr. and Mrs. Dolch and books authored by others. The plaintiffs controvert both of those contentions. It appears that the defendants ceased to use The Gelles-Widmer Company as a distributor in 1960 and it is no longer a party in interest.

18. The contract in question was entered into on May 3, 1958. Edward W. Dolch died on October 3, 1961. On March 26, 1964, the defendants filed an answer and counterclaims. In one of those counterclaims they asserted that the contract was terminated by the death of Edward W. Dolch. In another counterclaim they asserted that the provisons of the contract did not prohibit them from including books authored by Mr. and Mrs. Dolch in the same catalog with books authored by others. It was in those counterclaims that the defendants first made the contentions here involved.

19. The plaintiffs point out that the contention of the defendants that the contract was terminated by the death of Edward W. Dolch was first made around two and one-half years after his death. They assert that during the period between his death and up until the filing of the counterclaims the parties regarded and treated the contract as being in full force and effect. The plaintiffs also point out that the contention of the defendants that the contract did not prohibit them from including books authored by Mr. and Mrs. Dolch in the same catalog with books authored by others was first made nearly six years after the contract was executed. They assert that during that six-year period the defendants and the Dolches and their representatives concurred in interpreting the contract as prohibiting the inclusion of books authored by Mr. and Mrs. Dolch with books authored by others.

The defendants contend that the nature of the service to be rendered by Ed-

ward W. Dolch was essentially so personal in nature and objective that it must be regarded that the contract terminated on his death. The plaintiffs make a number of contentions in that connection. They point out that Mrs. Dolch was a party to the contract and that in paragraph 10 thereof it is provided: "Mrs. Dolch shall be deemed a beneficiary of the various covenants of this agreement whenever benefits are herein conferred upon her." They also point out that in paragraph 12 of the contract it is provided: "This agreement shall be binding upon the heirs, representatives, successors and assigns of the parties hereto."

The defendants during the period of time here pertinent published children's books authored by others than Mr. and Mrs. Dolch. Those books were known as Garrard books. The books authored by Mr. and Mrs. Dolch were known as Dolch books.

On October 8, 1962, more than a year after the death of Mr. Dolch, a letter was written by Mr. Garrard to Mrs. Dolch. That letter was in response to a letter from Mrs. Dolch inquiring about making arrangements to sell the Dolch books in the trade market. In the letter Mr. Garrard wrote that such arrangements could not be made because the trade publishers would not agree to the restriction that "Dolch books cannot be put in a catalog with books by other authors." He further wrote: "Because of our agreement with you we cannot publish one catalog. We must produce two—a Dolch book catalog and a Garrard book catalog." He further wrote: "Please do not interpret my purpose to be to disturb, or in any way circumvent, our agreement with you on these matters." Mr. Garrard testified that his reference to the request of a separate catalog for Dolch books was a reference to the provisions of paragraph 2 of the contract. On October 25, 1962, more than a year after the death of Mr. Dolch, a letter was written by Mr. Garrard to an attorney for the plaintiffs. In it he wrote, in part, as follows: "I am, however, concerned about the restriction on our advertising which will not permit us to publish one catalog of our books * * *."

It is apparent that Mr. Garrard regarded the contract as continuing to be in full force and effect notwithstanding the death of Mr. Dolch.

The matter of the catalog restriction was also the subject of correspondence between Mr. Dolch and Mr. Garrard during the lifetime of the former. On October 12, 1960, Mr. Garrard wrote Mr. Dolch, in part, as follows:

"* * * [O]ur agreement with you is very definite that your books are not to appear in a Garrard Press catalog listing books of other authors. * * * I'm not attempting to hedge on our agreement * * *.

"* * *

"* * * I fully recognize our agreement and will abide by it, unless you agree that a publisher's catalog of books is a different matter than the identification of your name with teaching aids. * * *"

Mr. Dolch did not so agree. On October 20, 1960, Mr. Garrard wrote Mr. Dolch, in part, as follows:

"I am disappointed that you do not want your books in a general Garrard Press catalog, but as I mentioned [sic] in my previous letter, it is our definite previous understanding that this will not be done, so there is no basis for me to pursue the matter. * * *"

The defendants published a number of catalogs over the years following the execution of the contract. The catalogs listing the Dolch books did not list books authored by others.

It is clear that at all times subsequent to the execution of the contract and up to the time of the defendants' filing of their counterclaims on March 26, 1964, the parties in interest concurred in the views that the contract was not terminated by the death of Mr. Dolch and that under its provisions the defendants were required to publish the Dolch books in a separate catalog.

The provisions of the contract which the parties claim bear on the matter of its termination by the death of Mr. Dolch and on the matter of a separate catalog leave those matters in doubt.

It was the long continued construction and interpretation of the contract by the parties prior to controversy that it was not terminated by the death of Mr. Dolch.

It was the long continued construction and interpretation of the contract by the parties prior to controversy that it prohibited the issuance of catalogs which included both books authored by Mr. and Mrs. Dolch and books authored by others.

It is the view of the Court that in this case the rule relating to the practical construction and interpretation of a contract by the parties prior to controversy is properly applicable. Under that rule weight is to be given by this Court to the practical constructions and interpretations referred to, and it so does.

20. It is the holding of the Court that the contract was not terminated by the death of Mr. Dolch.

21. It is the holding of the Court that under the provisions of the contract the defendants may not publish catalogs which include both books authored by Mr. and Mrs. Dolch and books authored by others.

The foregoing constitutes the Findings of Fact by the Court.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter of the action and the parties to the action.

2. Under the three publication contracts here involved, the defendants have the right to publish in paperback form each of the books named therein.

3. The plaintiffs are not entitled to a rescission of such rights.

4. The contract dated May 3, 1958, was not terminated by the death of Mr. Dolch but remains in full force and effect.

5. Under the provisions of the contract dated May 3, 1958, the defendants may not issue any catalog which includes therein both books authored by Mr. and Mrs. Dolch and books authored by others.

## ORDER FOR JUDGMENT

It is hereby ordered that judgment shall be entered:

1. Adjudging and declaring that under each of the three publication contracts here involved the defendants have the right to publish in paperback form the books named therein;

2. Denying the request of the plaintiffs for the rescission of the three contracts as to such rights;

3. Adjudging and declaring that the contract of May 3, 1958, was not terminated by the death of Mr. Dolch;

4. Adjudging and declaring that under the provisions of the contract of May 3, 1958, the defendants may not issue any catalog which includes both books authored by Mr. and Mrs. Dolch and books authored by others.